# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

ABDUL K. MUHAMMAD,

        Petitioner,

v.                                           Case No. 08-CV-937

MICHAEL THURMER,

        Respondent.

_____

## ORDER

Petitioner Abdul K. Muhammad ("Muhammad") asks the court to grant him a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Muhammad challenges his convictions for first-degree intentional homicide by use of a dangerous weapon, attempted first-degree intentional homicide by use of a dangerous weapon, and party to a crime. He asserts violations of the Sixth and Fourteenth Amendments based on the trial court's refusal to grant a continuance so that he could produce an incarcerated defense witness, and the court's admission of witness testimony identifying Muhammad as the shooter when the witness was previously unable to identify him. For the reasons stated below, the court will deny Muhammad's habeas petition.

## BACKGROUND

The charges against Muhammad arose from a close-range shooting that resulted in the death of one male, Jacques Williams ("Williams"), and the injury to a second male, Marlon Lewis ("Lewis"). On the afternoon of July 23, 2003,

Muhammad and Randy Johnson ("Johnson") were passengers in a Suburban truck driven by George Payne ("Payne"). The Suburban pulled up next to a Cadillac car and shots were fired from the Suburban's passenger side window into the driver's side of the Cadillac. Lewis, who was driving the Cadillac at the time of the shooting, suffered several non-fatal gunshot wounds. Williams, who was riding in the passenger seat, suffered a single bullet wound to the chest and did not survive.

Muhammad does not contest any of the relevant facts, other than the identity of the shooter. He admits that he was a passenger in the Suburban during the shooting, but denies firing any shots at Lewis and Williams. Muhammad took his case to trial and argued that Payne, the driver of the Suburban, was the actual shooter. Muhammad concentrated his defense on creating reasonable doubt about whether he fired the shots that killed Williams and injured Lewis.

The police never recovered the weapon used in the shooting. However, they determined that the shooter used .40 caliber bullets and that all the bullets came from the same gun - an Israeli Military Industries .40 caliber firearm. One model of a .40 caliber Israeli Military Industries weapon is the "Desert Eagle." This information is important because Muhammad intended to call a defense witness at trial to testify that the witness sold a Desert Eagle handgun to Payne approximately eight months earlier. The police also uncovered a box of .40 caliber bullets from Payne's residence, but determined that the bullets used in the shooting did not come from Payne's box of ammunition.

-2-

Muhammad proved more difficult for law enforcement to locate than the ballistics evidence. Indeed, he left town shortly after the incident and traveled to Jackson, Mississippi, where he was arrested approximately one year later. Muhammad was then transported back to Milwaukee and went to trial on October 31, 2005, two years and three months after the shooting. Muhammad's jury trial lasted four days and involved the testimony of Lewis, the surviving victim, Johnson, the third passenger in the Suburban, Muhammad himself, and Shalisa Hamilton, a teenaged bystander who witnessed the events from across the street.

Lewis testified that he knew Muhammad, Johnson and Payne and that there had been some previous bad blood between them. He also testified that on the afternoon of the shooting, he was driving through the neighborhood when he saw Muhammad, Johnson and Payne in a Suburban at a stop sign across the intersection. Lewis believed he saw Johnson pass a gun to Muhammad. Lewis then turned the corner and drove away. The Suburban followed and pulled up alongside the driver's side door of Lewis's car. Shots were fired from the Suburban, which was positioned a few feet away. Lewis testified that he looked over at the Suburban and saw Muhammad firing a handgun at him. Lewis was hit by several bullets but managed to pull away in his vehicle. He realized only later that his passenger, Williams, had been shot.

Johnson also testified at the trial and verified that he was present inside the Suburban at the time of the shooting. Johnson stated that he was riding in the

backseat of the Suburban when it pulled up next to Lewis's car. Johnson heard shots fired from a single gun and ducked down for cover, not knowing where the shots were coming from. After the gunfire stopped, Johnson sat up and witnessed Muhammad tucking an automatic handgun into his waistband. Johnson asked Muhammad what happened and Muhammad responded that it was none of Johnson's business.

Muhammad then testified in his own defense and gave an alternative version of events. Muhammad stated that he was in the backseat of the Suburban and that Johnson was in the front passenger seat next to Payne, who was driving. Payne pulled up next to Lewis's car and told Johnson to lean back in his seat. According to Muhammad, Payne then pulled out a gun, reached across Johnson and fired shots out the passenger side window of the vehicle. Muhammad testified that he believed he had previously seen the gun Payne used during the shooting. Several years earlier, Muhammad witnessed Payne purchasing a .40 caliber Desert Eagle semiautomatic weapon from someone named "Chris." After the shooting, Payne returned to his house and reloaded his gun. Muhammad reported that Payne threatened Muhammad and his family in order to keep him quiet. Muhammad offered this threat as an explanation for why he did not turn himself in or report the incident, despite his protested innocence. Muhammad admitted that he learned the police were looking for him several days after the shooting, but he did not contact law enforcement before leaving for Mississippi.

The defense called one other witness, Shalisa Hamilton. Hamilton was sixteen at the time of the trial and stated that she witnessed the shooting from across the street. Hamilton testified that she first saw a Suburban and a car pulled up next to one another. She watched as the passenger in the Suburban extended his arm and shot into the car, followed by return shots fired from the car towards the Suburban. Hamilton then witnessed the driver of the Suburban lean over and also shot into the adjacent car. She could not identify either of the individuals in the Suburban, but noted that the person in the passenger seat had braided hair. Hamilton then concluded her testimony and left the witness stand.

However, this was not the end of Hamilton's testimony. After her testimony and while she was seated in the courtroom, Hamilton flagged down the prosecutor during a break in the trial. She was upset and crying and indicated to the prosecutor that she wanted to speak with him. The prosecutor approached Hamilton and asked whether she recognized Muhammad. She confirmed that she did and identified Muhammad as the passenger in the Suburban.

The prosecutor sought leave of the court to allow Hamilton to return to the witness stand, which Muhammad opposed. The court granted the request and allowed Hamilton to be recalled as a witness. Hamilton testified that she recognized Muhammad from the shooting and explained that she had been crying because she was scared to be in front of him in the courtroom. Hamilton also stated that she had previously been shown a picture of Muhammad by a defense investigator and

-5-

recognized him, but had informed the investigator at that time that she could not identify Muhammad from the incident. Despite acknowledging her earlier statements to the investigator that she could not identify Muhammad, Hamilton indicated on the stand that she was now a "hundred percent" sure that she recognized Muhammad from the shooting.

The defense called only Muhammad and Hamilton as witnesses, but had intended to call an additional witness, Christopher Phillips ("Phillips"). The defense expected Phillips to testify that he sold a Desert Eagle handgun to Payne in December 2002. Defense counsel suggested that the testimony was relevant because it showed that Payne, the individual whom Muhammad claimed was the shooter, possessed a weapon of the type employed in the shooting. Defense counsel additionally noted that Phillips would testify that the gun could hold a total of eleven bullets, the number of bullets missing from the box of ammunition located at Payne's residence. Counsel admitted, however, that Muhammad could not identify the weapon Payne purchased from Phillips as the same weapon used at the time of the shooting. Muhammad was not able to obtain Phillips's testimony because Phillips was in state custody at the time of the trial and the proper paperwork to obtain his presence in court was never completed. Consequently, the defense requested an adjournment to allow Phillips to be produced to testify. The court denied the request and Muhammad proceeded without the testimony. Muhammad now asserts constitutional violations arising from his inability to present

-6-

Phillips's testimony, and from the "suggestive circumstances" surrounding Hamilton's belated identification.

## ANALYSIS

The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) limits a federal court's ability to grant a writ of habeas corpus to a state prisoner whose claims were adjudicated on the merits in state court. *See* 28 U.S.C. § 2254(d)(1). A habeas petitioner is only entitled to relief from a state court decision denying him post-conviction relief if that decision: 1) was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court; or 2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Badelle v. Correll*, 452 F.3d 648, 654 (7th Cir. 2006). A state court decision is "contrary to" clearly established federal law if it is substantially different than relevant United States Supreme Court precedent because the decision applies a contradictory rule or reaches a different result on materially indistinguishable facts. *Id*. "Clearly established" federal law constitutes the holdings of Supreme Court decisions at the time of the relevant state-court decision. *Malinowski v. Smith*, 509 F.3d 328, 335 (7th Cir. 2007) (quoting *Muth v. Frank*, 412 F.3d 808, 814 (7th Cir. 2005)).

Muhammad claims that his Sixth and Fourteenth Amendment rights were violated by the Wisconsin Court of Appeal's decision affirming his convictions. Muhammad first asserts that the trial court's refusal to grant a continuance to allow

-7-

him to present testimony from Phillips violates his right to present witnesses in his own defense. Muhammad next asserts that the trial court's actions in allowing Hamilton's testimony identifying him as the shooter violates his due process rights because the "highly suggestive" circumstances under which it was elicited create an impermissible danger of misidentification. The court finds no merit in either of Muhammad's arguments.

**A.      Inability to Present a Defense Witness**

Muhammad argues that the Wisconsin Court of Appeals violated clearly established federal law or made an unreasonable determination of the facts by upholding the trial court's denial of a continuance to allow for the production of Phillips as a defense witness. The Wisconsin Court of Appeals found that the trial court erred in denying Muhammad a continuance. *State v. Muhammad*, 2007 WI App 162, 303 Wis. 2d 747, 735 N.W.2d 194. However, the appellate court affirmed the trial court after determining that the error was harmless because Phillip's testimony would not have altered the outcome of the case. *Id.* at ¶ 14. The Wisconsin Court of Appeals explained that Phillip's testimony would not be helpful in exonerating Muhammad because the testimony would merely establish that Payne and Muhammad had access to a gun of the type used in the shooting. *See id.* Further, one of the victims viewed Muhammad from close range during the shooting and positively identified him as the perpetrator. *Id.* at ¶ 15. Finally, the court noted that there was no guarantee that Phillips would testify, given that he must waive his

-8-

Case 2:08-cv-00937-JPS    Filed 04/30/10    Page 8 of 20    Document 22

Fifth Amendment rights and confess to selling a firearm to Payne. *Id.* at ¶ 16. For these reasons, the court determined that an error in denying Muhammad a trial continuance to present testimony from Phillips would not have altered the trial outcome and constituted harmless error.

Muhammad fails to establish that the Wisconsin Court of Appeals decision is contrary to clearly established federal law or an unreasonable determination of the facts because the trial court's error was indeed harmless. The United States Supreme Court applies a harmless error standard embodied in *Brecht v. Abrahamson* when evaluating a collateral attack on a state court judgment. 507 U.S. 619 (1993). This harmless error standard considers whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637–38 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Here, the court must determine whether the jury's guilty verdict would be affected by hearing Phillip's testimony that Payne purchased a Desert Eagle handgun eight months prior to the shooting. The court concludes that the testimony would not substantially impact the verdict, given the totality of the evidence.

Three eyewitnesses presented evidence pointing to Muhammad as the shooter. Most importantly, Lewis testified that he knew Muhammad and that Muhammad had shot him at point blank range. As one of the victims, Lewis had a front row seat to the events and the shooting likely made a lasting impression upon him. Johnson also provided testimony identifying Muhammad as the shooter.

-9-

Johnson was also positioned within feet of both Muhammad and the victims and reported that Muhammad had a weapon in his hand immediately following the gunfire. Finally, an uninvolved eyewitness identified Muhammad as the shooter. Hamilton watched the incident from a position across the street and testified at trial that she was a "hundred percent" sure that she had seen Muhammad shooting from the passenger seat of the Suburban.[1]

In addition, the expected testimony itself has little value for raising reasonable doubt in the minds of the jurors. Muhammad expected Phillips to testify that Phillips sold Payne a Desert Eagle handgun eight months prior to the shooting. This evidence establishes little except that Payne owned a weapon of the type that was used in the shooting. It does not establish that the weapon Payne purchased was the firearm used in the shooting. It does not establish that Payne ever fired the weapon during the events in question, or that he ever fired the handgun he purchased from Phillips at all. Finally, the testimony does not exonerate Muhammad in any way. An individual may easily brandish or fire a weapon without actually owning that weapon. Even if the handgun Payne purchased was the same gun used in the shooting, a scenario which Muhammad could not verify, Muhammad could have received the weapon from Payne and used it himself. Indeed, Lewis testified that he saw Johnson pass a gun to Muhammad prior to the shooting.

---

[1] The court notes that Muhammad objects to Hamilton's testimony identifying him as the shooter. The court will address this argument in the following section.

-10-

Muhammad also expected Phillips to testify that the gun he sold to Payne could hold eleven bullets, the same number of bullets missing from the ammunition box in Payne's residence. This testimony is similarly unhelpful. Police ballistics verified that the ammunition found at Payne's house was not the type used during the shooting. Therefore, the only benefit for Muhammad in submitting Phillip's testimony is to lend credibility to Muhammad's claim that Payne returned to his house after the shooting and reloaded his gun - a gun which holds eleven bullets. Testimony corroborating Muhammad's assertion that Payne reloaded his gun after the shooting may provide some support for his general credibility as a witness. However, this fact does not alter the court's determination regarding the balance of the evidence. All testimony, other than Muhammad's own self-serving story, identifies Muhammad as the shooter. Further, Muhammad fled the state shortly after the incident, despite knowing that he was "suspected" by the police. He made no attempt to come forward and clear his name and protest his innocence. Consequently, the court cannot find that the absence of Phillip's testimony had any substantial or injurious effect or influence on the verdict. Thus, the decision of the Wisconsin Court of Appeals finding that the denial of a trial continuance was harmless error does not constitute a contrary or unreasonable application of clearly established federal law or an unreasonable determination of the facts.

**B. Witness Identification Under "Suggestive" Circumstances**

Muhammad next argues that the Wisconsin Court of Appeals violated clearly established federal law by affirming the trial court's decision to allow a witness to return to the stand and testify that Muhammad was the shooter when she was previously unable to identify him. The respondent argues that Muhammad procedurally defaulted this claim because he failed to present the issue in federal constitutional terms, but rather presented the issue to the state courts as one of misuse of trial court discretion. Therefore, the court must first address this procedural issue before proceeding to the merits of Muhammad's claim.

A petitioner must fully and fairly present his federal claims to the state courts in order to avoid procedural default and qualify for habeas relief. *Anderson v. Benik*, 471 F.3d 811, 815 (7th Cir. 2006). "Fair presentment" requires the petitioner to submit the substance of his claims to the state court by presenting both the operative facts and the controlling law. *Id.* In determining whether a petitioner fairly presented his federal claim to the state court, a federal court must consider the following: 1) whether the petitioner relied on federal cases engaging in a constitutional analysis; 2) whether the petitioner relied on state cases applying a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms calling to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation. *Id.* (quoting *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001)).

Muhammad disagrees that he failed to present his constitutional claim to the state courts and argues that he framed the claim in terms specific enough to call to mind a due process violation. Muhammad also argues that he cited case law applying a constitutional analysis. In his argument to the Wisconsin Court of Appeals, Muhammad relied heavily upon *State v. Hibl*, 2006 WI 52, 290 Wis. 2d 595, 218 N.W.2d 354 (1975), a case in which the Wisconsin Supreme Court dictated an analytical framework for determining when the circumstances surrounding a spontaneous, in-court identification are so highly suggestive that a trial court should exercise its gate-keeping function under Wisconsin Statute § 904.03 to exclude the testimony. The Wisconsin Supreme Court specifically declined to rule that the admission of identification evidence in *Hibl* would violate due process. *Id.* at ¶ 47. Instead, the court remanded the case to the circuit court to determine whether witness identification of the defendant should be excluded pursuant to the state statute. *Id.* at ¶ 55.

Muhammad's reliance upon *Hibl* does not establish that he fully and fairly presented a due process claim to the state courts, because *Hibl* does not rely upon a constitutional analysis. The court in *Hibl* does cite to United States Supreme Court cases *Manson v. Braithwaite*, 432 U.S. 98 (1977), and *Neil v. Biggers*, 409 U.S. 188 (1972), which interpret the due process clause. However, the Wisconsin Supreme Court does not rely upon the constitutional analysis contained in the United States Supreme Court cases. Instead, the Wisconsin Supreme Court merely notes that the

federal cases form the basis for an analytic framework used in a particular line of state cases involving identifications made as a result of police "show up" procedures. *Id.* at ¶ 24. However, the Wisconsin Supreme Court distinguished these "show up" cases and found that the "show up" analytical framework did not apply to the facts before it because *Hibl* involved a spontaneous identification made outside of a courtroom. *Id.* at ¶¶ 28-30. Instead, the Wisconsin Supreme Court held that the admissibility of spontaneous identification testimony should be considered pursuant to the trial court's statutory gate-keeping function. *Id.* at ¶ 56. Thus, Muhammad did not rely on any federal or state cases applying a constitutional analysis.

Further, Muhammad did not make an argument to the Wisconsin Court of Appeals implicating his due process rights or allege facts within the mainstream of constitutional litigation. Muhammad asserted to the state appellate court that the trial court abused its discretion by not exercising its gate-keeping function under § 904.03 to exclude Hamilton's testimony. Therefore, he did not frame the issue in terms clearly calling to mind a constitutional issue. Additionally, the facts Muhammad alleges do not implicate a common constitutional issue because the particular circumstances of Hamilton's identification testimony are not addressed in the U.S. Supreme Court jurisprudence. Muhammad argues that a due process violation resulted from the court's failure to exclude the identification testimony of a witness who left the stand, subsequently made a spontaneous identification of the defendant, and then returned to the stand to identify the defendant as the

perpetrator. This scenario may raise a question of reliability, but Muhammad does not point to any analogous case or pattern of facts.

Despite the aforementioned, the court will not definitively conclude that Muhammad's claim is procedurally barred. Muhammad did not make a specific due process argument in his appellate brief, but the bones of the constitutional issue were sufficiently present to alert the Wisconsin Court of Appeals to its presence. Indeed, the state appellate court noted in its decision that Muhammad "contends that Hamilton's identification of him occurred under suspicious circumstances, and that the trial court erroneously exercised its discretion by not excluding the testimony as violating his due process rights." *Muhammad*, 2007 WI App 162, ¶ 17. The Wisconsin Court of Appeals also addressed the constitutional issue by finding that Hamilton's spontaneous identification of Muhammad did not implicate his due process rights because it did not result from police procedure or planned state action. *Id.* at ¶ 19 ("The spontaneous identification of Muhammad, however, was not the result of any police procedure or the State's planned action. As such, the identification does not implicate Muhammad's due process rights."). Because the due process issue was identified by the state appellate court, this court will not find the claim procedurally barred based on a lack of fair presentment.

Unfortunately for Muhammad, his due process claim survives the procedural hurdle only to fail on the merits. The state court decision is not contrary to or an unreasonable application of clearly established federal law, nor is it based on an

-15-

Case 2:08-cv-00937-JPS   Filed 04/30/10   Page 15 of 20   Document 22

unreasonable determination of the facts. A decision is contrary to clearly established law when the state court reaches a different result from the Supreme Court, despite being confronted with materially indistinguishable facts. *Williams v. Thurmer*, 561 F.3d 740, 742-43 (7th Cir. 2009). Muhammad fails to present a case with facts materially indistinguishable from those at issue here - a witness who could not previously identify the defendant returning to the stand after spontaneously identifying the defendant on her own.

The U.S. Supreme Court cases cited by Muhammad implicate due process rights arising from witness identifications. However, the cases all involve suggestive circumstances caused by procedures employed by the police. In *Manson v. Braithwaite*, a police officer identified a defendant after examination of the only photograph presented to him. 432 U.S. 98 (1977). In *Neil v. Biggers*, a witness identified the defendant at the police station after a "showup," wherein two detectives walked the defendant past the witness for the purpose of identification. 409 U.S. 188 (1972). Similarly, in *Stovall v. Denno*, the defendant was identified by the witness after he was presented to her singly while handcuffed to a police officer. 388 U.S. 293 (1967). Muhammad also cites to *Foster v. California*, in which the witness identified the defendant after viewing two highly suggestive police lineups in which the defendant was dressed similar to the perpetrator and was the only individual to

appear in both lineups. 394 U.S. 440 (1969). The last case[2] cited by Muhammad, *Watkins v. Sowders*, also involves witness identifications made after a police lineup and "showup" procedure. 449 U.S. 341 (1981).

The U.S. Supreme Court cases do not contain facts materially indistinguishable from the instant case because the identification here does not arise from suggestive law enforcement procedures. Further, the Supreme Court did not reach a different result in the majority of the cited cases than the state appellate court reached in Muhammad's case. The U.S. Supreme Court affirmed the convictions of the defendants in all of the aforementioned cases, except *Foster*. *Braithwaite*, 432 U.S. at 98 (denied habeas relief); *Biggers*, 409 U.S. at 188 (denied habeas relief); *Stovall*, 388 U.S. at 296 (denied habeas relief); *Foster*, 394 U.S. at 444 (reversing the California Supreme Court's decision upholding the defendant's conviction); *Watkins*, 449 U.S. at 349 (denying habeas relief). Therefore, the Wisconsin Court of Appeals did not reach a different result than the Supreme Court after being presented with materially indistinguishable facts.

---

[2] The Court notes that Muhammad also cites to *Kirby v. Illinois*, 406 U.S. 682 (1972). However, in that case, the Supreme Court addressed the issue of whether identification testimony based upon a police station "showup" that took place before the defendant was indicted violates the Sixth Amendment if the defendant does not have counsel at the "showup." *Id*. at 683-84. The Supreme Court did not determine whether a due process violation arose from the particular circumstances of the case. *Id*. at 692 n.8 ("In view of our limited grant of certiorari, we do not consider whether there might have been a deprivation of due process in the particularized circumstances of this case. That question remains open for inquiry in a federal habeas corpus proceeding."). Therefore, the court cannot evaluate whether the Supreme Court reached an opposite conclusion based on materially distinguishable facts because the court did not analyze the constitutional issue involved in the instant case.

Alternatively, a state court decision may be contrary to clearly established law when it identifies the correct standard from federal law, but unreasonably applies it to the facts. *Williams*, 561 F.3d at 743. "A court's application of Supreme Court precedent is reasonable as long as it is 'minimally consistent with the facts and circumstances of the case.'" *Id.* (quoting *Schaff v. Snyder*, 190 F.3d 513, 523 (7th Cir. 1999)). A state court decision will only be deemed unreasonable if its application of Supreme Court precedent falls outside the "boundaries of permissible differences of opinion." *McFowler v. Jaimet*, 349 F.3d 436, 447 (7th Cir. 2003).

Muhammad fails to show that the Wisconsin Court of Appeals made an unreasonable determination based on the facts. A denial of due process may occur when an identification is unnecessarily suggestive and conducive to irreparable mistaken identification. *See Stovall*, 388 U.S. at 301-02. However, whether such a violation occurred depends upon the "totality of the circumstances surrounding it." *Id.* To assess whether a suggestive identification procedure gave rise to a due process violation, the court must weigh the suggestive identification procedure against the following five factors: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the prior description of the criminal; 4) the level of certainty demonstrated at the identification; and 5) the length of time between the crime and the identification. *Biggers*, 409 U.S. at 199-200.

-18-

The Wisconsin Court of Appeals cited to these five factors, but determined that Hamilton's eyewitness identification did not violate Muhammad's due process rights because she made a spontaneous identification that did not result from any police procedure or premeditated state action. *Muhammad*, 2006 WI 162, ¶¶ 18-19. The court explained that Hamilton "made her identification on her own and then began the process of revealing this fact by getting the attention of the prosecutor." *Id.* at ¶ 19. In addition, the state court relied upon several of the appropriate facts in determining that Hamilton's identification was reliable. The court noted the following in reaching its decision: a) that Hamilton witnessed the crime for a substantial period of time; b) that Hamilton had a high degree of concentration; and c) that Hamilton testified that she was "100 percent" sure about the identification. *Id.* at ¶ 21. Therefore, this court cannot conclude that the decision of the Wisconsin Court of Appeals constitutes an inappropriate application of the law to the facts. The state court pointed to proper factors supporting the reliability of Hamilton's testimony and its ultimate determination appears reasonable given the totality of the circumstances. Therefore, the state court's decision was not an unreasonable application of the law to the facts.

Thus, the court is obliged to deny Muhammad's petition for a writ of habeas corpus and dismiss the case. At the same time, the court must also address whether to grant Muhammad a certificate of appealability (COA). A habeas petitioner must obtain a COA before he may appeal an unfavorable decision to the

-19-

Case 2:08-cv-00937-JPS    Filed 04/30/10    Page 19 of 20    Document 22

Seventh Circuit Court of Appeals. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A district court only issues a COA to a habeas petitioner if he makes a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). Under the revised rules governing § 2254 cases, a district court must either issue or deny a COA when it enters a final order adverse to the habeas petitioner. Rules Governing Section 2254 Proceedings in the United States District Courts, Rule 11(a). For the reasons discussed above, Muhammad fails to make a substantial showing of the denial of a constitutional right and the court will deny him a COA.

Accordingly,

**IT IS ORDERED** that Muhammad's petition for a writ of habeas corpus be and the same is hereby **DENIED** and the case is **DISMISSED with prejudice**. The court also **DENIES a certificate of appealability**.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 30th day of April, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge